# EXHIBIT 1

```
              UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                   CHARLOTTE DIVISION
         CIVIL ACTION NO. 3:22-CV-659-RJC - DK


MICHAEL KERNEA and CHRISTY KERNEA, )
                                   )
          Plaintiff,               )
                                   )
                                   )
          vs.                      )   D-E-P-O-S-I-T-I-O-N
                                   )
CITY OF CHARLOTTE, OFFICER LEE     )
LOWERY,                            )
                                   )
          Defendants.              )
-----------------------------------


                      LEE LOWERY


TAKEN AT LAW OFFICES OF:
FERGUSON, CHAMBERS & SUMTER, P.A.
309 E. Morehead Street, SUite 110
Charlotte, NC 28202


                 Thursday, June 13, 2024
                        1:33 p.m.


                     Tamara Mullis
                     Court Reporter


               Wyatt Legal Services, LLC
                3936 Elizabeth Glen Way
                  Jamestown, NC 27282
                    (336) 510-8515
```

---

**Page 2**

ATTORNEY NOTES

| PAGE LINE | SUBJECT MATTER | RELATES TO | ACTION |
|---|---|---|---|
| | | | |

---

**Page 4**

I N D E X

STIPULATIONS                                    5
EXAMINATION OF THE WITNESS:
    By Mr. James E. Ferguson            6, 138, 145
    By Mr. Roger A. McCalman            134, 144
ADJOURNMENT                                 149
REPORTER CERTIFICATE                        150

E X H I B I T S
Name                    Offered By          Identified
EXHIBIT ONE             Mr. Ferguson            72
(Arrest Processing Center Statement)
EXHIBIT TWO             Mr. Ferguson            74
(Email Statement from Sandra Richardson to David Prince)

---

**Page 3**

APPEARANCES OF COUNSEL

Roger A. McCalman, Esq.
ASSISTANT CITY ATTORNEY
CITY OF CHARLOTTE
600 East Fourth Street, Suite 454
Charlotte, NC 28202
Attorney for Defendants

James E. Ferguson, II, Esq.
FERGUSON, CHAMBERS AND SUMTER, P.A.
309 East Morehead Street, Suite 110
Charlotte, NC 28202
Attorney for Plaintiff

OTHER APPEARANCES
Tammy Wrobleski, City of Charlotte, North Carolina, Manager,
Claims & Litigation via Zoom
Michael Kernea via Zoom
Christy Kernea via Zoom

---

**Page 5**

STIPULATIONS

    Pursuant to Notice and/or consent of the parties, the deposition hereon captioned was conducted at the time and location indicated and was conducted before Tamara Mullis, Notary Public in and for the County of Iredell, State of North Carolina at Large.

    Notice and/or defect in Notice of time, place, purpose and method of taking the deposition was waived. Formalities with regard to sealing and filing the deposition were waived, and it is stipulated that the original transcript, upon being certified by the undersigned court reporter, shall be made available for use in accordance with the applicable rules as amended.

    It is stipulated that objections to questions and motions to strike answers are reserved until the testimony, or any part thereof, is offered for evidence, except that objection to the form of any question shall be noted herein at the time of the taking of the testimony.

    Reading and signing of the testimony was requested prior to the filing of same for use as permitted by applicable rule(s).

---

Page 54

1   up until the time you met Mr. Kernea -- and we'll
2   talk about that a little later --
3       A.  Okay.
4       Q.  -- Mr. Kernea.  Had you taken any kind
5   of drugs or medication or anything that altered
6   your perception --
7       A.  No, sir.
8       Q.  -- of reality?
9       A.  No, sir.
10      Q.  Nothing at all?
11      A.  No, sir.
12      Q.  Were you sick or injured in any way --
13      A.  No, sir.
14      Q.  -- that night?
15      A.  No, sir.
16      Q.  Okay.  So as far as you know, you were
17  your normal self?
18      A.  I was.
19      Q.  Doing what you normally do when you were
20  doing your police duty at the airport; is that
21  right?
22      A.  Yes, I was.
23      Q.  All right.  And up until that -- up
24  until later on that evening -- we'll come to that
25  in a moment -- you had never met Mike Kernea?

Page 55

1       A.  No, sir.
2       Q.  Never seen him.
3       A.  Never seen him.
4       Q.  Didn't know anything about him?
5       A.  Didn't know nothing about him.
6       Q.  And as far as you know, he knew nothing
7   about you?
8       A.  Far as I know.
9       Q.  You had never had any kind of encounter
10  with him at all?
11      A.  No, sir.
12      Q.  All right.  Now, I'm going to go ahead
13  and get to the point here.  When did you first
14  meet the plaintiff in this case, Mike Kernea?
15      A.  I first observed him sitting in a chair.
16      Q.  Sitting in a chair at the airport?
17      A.  At the airport, across from Starbucks.
18      Q.  Across --
19      A.  Across from Starbucks.
20      Q.  Across from Starbucks?  Yes, sir.
21      A.  He appeared to be waiting -- I guess for
22  his wife at that time.
23      Q.  Okay.
24      A.  So he was sitting in the chair.
25      Q.  So was he -- was he bothering anybody,

Page 56

1   as far as you know?
2       A.  No, sir.  He was just sitting in the
3   chair.
4       Q.  Was he breaking any law?
5       A.  No, he wasn't.
6       Q.  I suspect that you've seen people sit in
7   chairs at Starbucks and other places before who --
8   travelers coming and going and finding a place to
9   stop for a moment or rest or whatever.  That
10  wasn't -- that was nothing out of the ordinary,
11  was it?
12      A.  Only thing out the ordinary was the
13  chair he was sitting in belonged to a -- a bar
14  right next to where his chair was at.
15      Q.  Belonged to a --
16      A.  A bar that was inside the airport.
17      Q.  A bar?
18      A.  Yes, sir.
19      Q.  By bar, you mean a place where they
20  serve --
21      A.  They can drink alcohol.
22      Q.  -- alcohol?  Yes, sir.
23      A.  Yes, sir.
24      Q.  All right.
25      A.  They have alarms because people move

Page 57

1   their chairs.  So they have alarms that be going
2   off and on.  So you go over there a move a chair,
3   you can hear a alarm.  They might not hear it, but
4   they train us how to hear the alarm that goes off.
5       Q.  So you can hear the alarm, but --
6       A.  We can hear it, but they not -- they not
7   going --
8       Q.  No ordinary citizen like Mike -- Mike
9   Kernea might not hear that alarm?
10      A.  They wouldn't know what it is at all.
11      Q.  Now, was there anything in that area
12  that you know of that would tell Mike Kernea or
13  anybody -- any other airport passerby, don't sit
14  in this chair?
15      A.  No.
16      Q.  As a matter of fact, with the chair
17  sitting where it was, people passing by might be
18  weary or needed to take a stop or break, or wait
19  for somebody inside of a store or something there
20  at the airport might sit in the chair and take a
21  rest and -- for a moment or whatever; isn't that
22  true?
23      A.  If that chair was there, I'm quite sure
24  that would be true, but that chair didn't belong
25  there.

Wyatt Legal Services, LLC
336-510-8515                                    hdwyatt@gmail.com
Case 3:22-cv-00659-MEO-DCK    Document 74-1    Filed 02/13/26    Page 4 of 8

Page 58

1  Q. It didn't belong there?
2  A. Correct.
3  Q. Who put it there?
4  A. I have no clue.
5  Q. Okay. You didn't see Mike Kernea move
6  the chair and put it somewhere it wasn't supposed
7  to be, did you?
8  A. All I saw was him sitting there for a
9  minute.
10  Q. You saw him sitting in the chair?
11  A. I saw him sitting in the chair. That
12  was it.
13  Q. But you didn't -- you hadn't -- you
14  didn't see him take the chair from somewhere it
15  was supposed to be and put it back to another
16  place or anything like that? You didn't see him
17  move the chair?
18  A. I didn't see him move the chair, no.
19  Q. All right. Tell us how and when, if you
20  can, you first noticed Mike Kernea, now that you
21  know who Mike Kernea is?
22  A. When he was sitting out there at the
23  chair --
24  Q. You saw him sitting in the chair?
25  A. Right.

Page 59

1  Q. Well, was he -- was he harassing anybody
2  sitting in the chair?
3  A. No, sir.
4  Q. Was he breaking the law, any law that he
5  would have known about, sitting in the chair?
6  A. I wouldn't think so.
7  Q. Were there any signs posted saying don't
8  sit in this chair?
9  A. No sign that I can recall.
10  Q. You've never seen a sign saying don't
11  sit in that particular chair?
12  A. All I know, where they had the chair,
13  they got a rope going around the thing so people
14  won't move that chair for that reason, but --
15  Q. Yes, sir.
16  A. -- I never seen a sign that say don't
17  sit in that chair.
18  Q. Yes, sir. Would a person moving -- and
19  I'm not -- I'm not talking about just Mike Kernea,
20  but if some -- some airport passerby walked by the
21  chair and moved the chair, would that be breaking
22  any law that you know of?
23  A. No, sir.
24  Q. So there was no law that said that a
25  citizen can't move this chair; is that right?

Page 60

1  A. You're right.
2  Q. So even if -- and I'm not saying he did.
3  Even if Mike Kernea had moved that chair, would he
4  be breaking a law, that you know of?
5  A. Not that I know, no.
6  Q. Yes, sir. All right. So you -- tell us
7  what you observed when you first -- what you
8  remember about first observing Mike Kernea? You
9  know who Mike Kernea is now?
10  A. Yes.
11  Q. Yes, sir. Tell us what you --
12  A. Starbucks was full of people.
13  Q. Starbucks was full of people? All
14  right.
15  A. So it was a good long line in there and
16  I imagine that's probably why he decided to sit in
17  the chair to wait for the wife.
18  Q. Yes, sir. As you understand, his wife
19  went into Starbucks?
20  A. As far as I know, yes.
21  Q. Yes, sir. All right. So he's sitting
22  in a chair waiting for his wife to come out of
23  Starbucks; is --
24  A. Yes, sir.
25  Q. -- that right? Okay. So what -- what

Page 61

1  -- when you -- what first called your attention to
2  Mike Kernea? How did you first happen to notice
3  him, as far as you can remember?
4  A. When they walked away from the chair,
5  the chair was still there.
6  Q. Now, when you say "when they walked away
7  from the chair," what are --
8  A. Okay.
9  Q. -- we talking about?
10  A. I guess his wife came out the --
11  Q. Yes, sir.
12  A. -- Starbucks.
13  Q. All right.
14  A. And they walked away, but the chair was
15  still there.
16  Q. Okay.
17  A. So I walked up to him and asked him,
18  sir, could you move the chair back over,
19  basically.
20  Q. Uh-huh.
21  A. And -- and everything went sideways
22  after that.
23  Q. Well, yeah, but I want to take it step
24  by step and I appreciate you giving me as much
25  detail as you can?

Wyatt Legal Services, LLC
336-510-8515                          hdwyatt@gmail.com
Case 3:22-cv-00659-MEO-DCK   Document 74-1   Filed 02/13/26   Page 5 of 8

Page 62

1      A.  Uh-huh.
2      Q.  So -- and I want to make sure you
3  understand everything I ask you because this is a
4  -- this is an important part of what we're going
5  to talk about?
6          If I understand you correctly, and you
7  tell me if I'm wrong here?  You saw Mr. Kernea --
8  when you first saw Mr. Kernea, he was sitting in
9  the chair?
10     A.  Correct.
11     Q.  Did you see him move the chair before he
12 sat in it?
13     A.  I didn't.
14     Q.  So as far as you know, he was sitting in
15 a chair that he just happened to see --
16     A.  Correct.
17     Q.  -- as he was apparently waiting for his
18 wife; is that right?
19     A.  Correct.
20         MR. MCCALMAN:  Objection as to
21 form.
22     Q.  Had you seen Mike Kernea do anything
23 that you considered a violation of the law?
24     A.  No, I didn't.
25     Q.  Okay.  So when you said to him would you

Page 63

1  move the chair back -- and tell me what you said
2  -- just tell me what you said when you first saw
3  him?
4      A.  I say could you move the chair back and
5  he say -- he say I didn't move that damn chair,
6  basically.
7      Q.  Okay.
8      A.  And -- then I walked up to him.  I
9  say I saw you sitting in the chair, sir.  I just
10 wanted you to move it back, basically.  And he
11 started getting louder and --
12     Q.  He said what?
13     A.  -- and louder.  He started getting
14 louder.
15     Q.  He started getting loud.  Okay.
16     A.  And louder.
17     Q.  And did you get louder along with him?
18     A.  No.
19     Q.  Okay.
20     A.  Because I kept my demeanor.  I say, sir,
21 you've got people over here sleeping.  You can't
22 be hollering like that.  You've got people
23 sleeping and I pointed over there where they was
24 sleeping at, over in that area --
25     Q.  Yes, sir.

Page 64

1      A.  -- where they were sleeping at.
2      Q.  Uh-huh.
3      A.  And he kept going louder and then cursed
4  a couple times.  And then I, like, sir, you've got
5  one more time to curse and I'm about to arrest you
6  for disorderly conduct.
7      Q.  Okay.
8      A.  So he say take me to F-ing jail, then.
9  So I reached out and grabbed his hand and he
10 spinned [sic] around, so I let go.  I let go --
11     Q.  Well, I -- I -- I do have to interrupt
12 you with one question?
13     A.  Okay.
14     Q.  Why did you grab his hand?
15     A.  Because I told him he cursed one more
16 time and make any more noise, I'm going to have to
17 charge him with disorderly conduct.
18     Q.  Okay.  So when he reached out his hand,
19 did you grab his hand?
20     A.  No.  His hand was right there.  And
21 after I told him if he keep going, I'm going to
22 have to take him -- I'm going to have to arrest
23 you.  And he say take me to F-ing jail.  So I said
24 okay and I reached out and grabbed his hand.  So
25 -- and he spinned around on me and I disengaged

Page 65

1  like that (indicating) and then I went back at
2  him.
3      Q.  Now, when you say you went back at him,
4  tell me what you mean?  Explain in detail what you
5  did?
6      A.  I don't remember -- they said -- on the
7  -- I watched the video and I could see myself
8  throwing a punch.  But I don't remember throwing a
9  punch at that time.
10     Q.  But you saw on the punch -- on --
11     A.  I seen -- I seen --
12     Q.  -- the video --
13     A.  -- on the video, though.
14     Q.  Did the video show that you --
15     A.  Yeah, and --
16     Q.  -- punched him?
17     A.  -- I didn't know that I hit him or not.
18 And then I grabbed him and I tried to take him to
19 the ground to cuff him and he was trying to get
20 up.
21     Q.  Okay.
22     A.  I guess he was on carpet and he had some
23 shorts on.  So when I was trying to take him down
24 to the ground, he was trying to get back up and
25 stuff and he basically -- he had -- what you call,

Wyatt Legal Services, LLC
336-510-8515                                    hdwyatt@gmail.com
Case 3:22-cv-00659-MEO-DCK    Document 74-1    Filed 02/13/26    Page 6 of 8

Page 82

1    Q.  And as I understand it, and you tell me
2  precisely, you charged him with two violations
3  that night?
4    A.  Correct.
5    Q.  One was disorderly conduct; is that
6  correct?
7    A.  Correct.
8    Q.  And one was resisting arrest?
9    A.  Correct.
10   Q.  Okay.  What, in your mind now, was the
11 disorderly conduct -- I'm sorry.  What, in your
12 mind at that -- on that night, was the disorderly
13 conduct that you charged Mike Kernea with?
14   A.  With that -- the screaming, hollering
15 and the cursing.
16   Q.  Screaming, hollering and cursing?
17   A.  Yes, sir.
18   Q.  All right.  And what was -- what was it
19 that he did that, in your mind, was resisting
20 arrest?
21   A.  When I told him he was under arrest, I
22 reached out to grab his arm to put the cuff on.
23 He spinned around on me and then I had to grab --
24 I guess -- as I swung at him --  I had to take --
25 I grabbed him, took him down -- he was trying to

Page 83

1  get up the whole time off the floor.
2    Q.  All right.  So you're saying that -- I'm
3  still trying to find out exactly what he did that
4  you considered to be resisting arrest?
5    A.  Well, usually, when you arrest somebody,
6  you tell them to put their hands behind they back,
7  you can cuff them.
8    Q.  Yes, sir.
9    A.  When I went to grab him to put the cuff
10 on, that's when he spinned around.
11   Q.  Uh-huh, okay.
12   A.  So when he spinned around, I disengaged
13 and from my watching that video, like, I threw a
14 punch.  And then I take control of his -- and take
15 him to the ground and try to hold him to the
16 ground by putting my weight on him.  He was still
17 trying to get off the ground, so that's what I
18 called resisting.
19   Q.  So you call that resisting arrest?
20   A.  Yes, sir.
21   Q.  All right.  Did you get the cuffs on
22 him?
23   A.  I -- when I was getting ready to cuff
24 him, his wife told me about the shoulder injury he
25 got.  He had surgery or something to that effect.

Page 84

1  So I cuffed him in the front.
2    Q.  All right.  But you -- you cuffed him?
3    A.  I did put cuffs on him, but I put them
4  in the front instead of putting them behind his
5  back so he --
6    Q.  By putting his hands in front --
7    A.  Yes.  I still cuffed him --
8    Q.  -- rather than behind; is that correct?
9    A.  I didn't want to damage that surgical --
10   Q.  Yes, sir.
11   A.  -- injury he had.
12   Q.  Okay.  Did you ever learn any -- did you
13 ever gain information or learn anything about any
14 injuries that Mike Kernea suffered that night?
15   A.  Later on, I read the -- the deposition
16 with Stephanie Webster.  I read what they had on
17 there.  She had sent me the thing to me.
18   Q.  And I -- I want to be clear about what
19 it is you read?
20   A.  The --
21      MR. MCCALMAN:  I'm going to object
22 to any -- he was previously represented by
23 Stephanie Webster --
24      MR. FERGUSON:  Yes, sir.
25      MR. MCCALMAN:  -- in his individual

Page 85

1  capacity, so I'm going to object as to what he
2  discussed with his attorney.  I don't -- I
3  personally don't --
4      MR. FERGUSON:  Yeah.  And I -- I
5  yeah.  I'm fine with that.  I'm not asking him
6  what he discussed with his attorney.  But I do
7  want to know what information you have about what
8  happened with Mike Kernea?
9    A.  Yeah.
10   Q.  And I'm -- I'll ask you a specific
11 question about that?  I'm not asking you any
12 question about any discussion you had with
13 Stephanie --
14   A.  Right.
15   Q.  -- Webster.  I'm not supposed to ask you
16 about the things you had -- any discussions you
17 had with your attorney, so don't -- don't take
18 anything I'm asking you as asking you to tell me
19 anything you said to her or she said to you, okay?
20   A.  Can I back up right quick now?
21   Q.  Yes, sir.  Please.
22   A.  It wasn't Stephanie.  It was the IA --
23 when I -- my sergeant called me and he showed me
24 the pictures.  That's what it was.  I'm sorry.  I
25 --

Wyatt Legal Services, LLC
336-510-8515                                hdwyatt@gmail.com
Case 3:22-cv-00659-MEO-DCK    Document 74-1    Filed 02/13/26    Page 7 of 8

Page 122

1          A.  She could be still around and stuff.  I
2     don't see her --
3          Q.  You don't -- you don't --
4          A.  -- that much --
5          Q.  -- see her that much, but as far as you
6     know --
7          A.  Yes.
8          Q.  -- she's still around the -- the area
9     here?
10         A.  Yes, sir.
11         Q.  At the time you reviewed the video with
12    her, or at any time, did you ever disagree with
13    anything on the video?
14         A.  No, I didn't.
15              MR. MCCALMAN:  Objection as to
16    form.
17         Q.  As far as you could tell, it was an
18    accurate video of what took place between you and
19    Mr. Kernea?  I know it couldn't video everything,
20    but --
21         A.  Right.
22         Q.  -- what you saw on the video, you didn't
23    say, oh no, that's not me or I didn't do that?
24         A.  No.  It's --
25         Q.  You didn't have any disagreement with

Page 123

1     that?
2              MR. MCCALMAN:  Objection as to
3     form.
4          A.  No, I didn't.
5          Q.  Okay.  And going back now to the
6     discipline that you were given by the department,
7     did you have any disagreement with the discipline
8     that you got?
9          A.  Only thing I disagree with is when they
10    take away officer's right, far as a charge go.
11    When you -- like charge them with something and
12    they tell you you shouldn't charge -- you never
13    charge people with that no more.  But it's still
14    in the law books.  It's still a part of -- a law.
15    That's the only thing I disagree with.
16         Q.  So when they disagreed with you about
17    the disorderly -- I mean, the -- what was it --
18         A.  Right.  Disorderly --
19         Q.  The disorderly conduct?
20         A.  Yes, sir.
21         Q.  You felt like they were in the wrong?
22         A.  I thought it was officer discretion.
23    That's why I was --
24         Q.  You thought you had the discretion to --
25         A.  To do that, right.  That's my point,

Page 124

1     yeah.
2          Q.  All right.  But of course, you know --
3     you know that the charges that you brought against
4     Mr. Kernea were eventually dismissed?
5          A.  Correct.
6          Q.  Did you have any disagreement with that?
7          A.  At that time, I was kind of like just
8     ready to get everything out the way, over,
9     basically.
10         Q.  Okay.
11         A.  That's how I felt.
12         Q.  All right.
13         A.  Yeah.
14         Q.  So you didn't express any disagreement
15    with anybody?  You didn't say, oh no, you can't
16    dismiss this charge or you can't dismiss that
17    charge?
18         A.  The reason why, I would have -- if I did
19    a appeal, I have to go back through the IA system
20    again.  And, you know, like I say, it's out of --
21         Q.  Well, you would have had to go through
22    the appeal process?
23         A.  Appeal, right.  Appeal process, again.
24    And I be like, you know, I'm -- I learned my
25    lesson.  I'm done with it.

Page 125

1          Q.  You accepted what -- what --
2          A.  I accepted what I had got.
3          Q.  -- what you had done?  And either before
4     or since this incident with Mr. Kernea, had you
5     had any other incident that you think is
6     comparable to this?
7          A.  No.  I'm going to tell you a funny one
8     --
9          Q.  Okay.
10         A.  -- that I dealt with.
11         Q.  Go ahead.
12         A.  Okay.  When I left the airport, I went
13    to the north division.
14         Q.  You went to --
15         A.  North division for six months before I
16    retired.
17         Q.  Okay.
18         A.  But I know I was going to come -- be
19    retiring by that time.
20         Q.  Yes, sir.
21         A.  So I spent my last six and a half months
22    in north division.  They number two over there --
23    first day I rode with another officer to find my
24    way around the city over there in that division.
25              The second day, I got a call for a

Wyatt Legal Services, LLC
336-510-8515                                    hdwyatt@gmail.com
Case 3:22-cv-00659-MEO-DCK    Document 74-1    Filed 02/13/26    Page 8 of 8